IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH FACEBOOK USER NAME "JJ WILLIAMS" FACEBOOK USER ID: 100052197997697 THAT IS STORED AT PREMISES CONTROLLED BY FACEBOOK INC. | Case No. 2:20-mj-00143 **Filed Under Seal** |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Special Agent Jim Lafferty, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.     I make this affidavit in support of an application for a search warrant for information associated with a certain Facebook user name that is stored at premises owned, maintained, controlled, or operated by Facebook Inc. ("Facebook"), a social networking company headquartered in Menlo Park, California.  The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Facebook to disclose to the government records and other information in its possession, pertaining to the subscriber or customer associated with the user name, JJ WILLIAMS, user ID 100052197997697.

2.     I am a Special Agent with the Federal Bureau of Investigation and have been so employed for approximately eighteen years.  I am current assigned to the Charleston, West Virginia, Resident Agency of the Pittsburgh Division.  My primary experience as a FBI Special Agent is in investigations related to complex white-collar crime matters, including public corruption and civil rights matters.  Prior to my employment with the FBI, I was employed as a

Certified Public Accountant with a public accounting firm for approximately four years. Throughout my law enforcement career I have received training on the use of social media to perpetrate and further criminal misconduct. In addition, I have worked multiple cases involving the use of on-line activity to enact and further criminal activity.

3.        The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.        Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. § 2, 18 U.S.C. § 1001 and 47 U.S.C. § 223 have been committed by KEVIN COMER. There is also probable cause to search the information described in Attachment A for evidence of these crimes as described in Attachment B.

## STATUTORY AUTHORITY

5.        This investigation concerns alleged violations of 18 U.S.C. § 2, 18 U.S.C. § 1001 and 47 U.S.C. § 223, relating to aiding and abetting a false statement being made to the FBI, and sending harassing communications.

     **a.**    18 U.S.C. § 2(a) prohibits any person from aiding or abetting the commission of another crime.

     **b.**    18 U.S.C. § 1001(a)(2) prohibits any person from knowingly and willfully making any materially false, fictitious, or fraudulent statement or representation in any matter within the jurisdiction of the executive, legislative, or judicial branch of government in the United States.

     **c.**    47 U.S.C. § 223(a)(1)(C) prohibits any person, in interstate or foreign communications, from knowingly making a telephone call or utilizing a telecommunication device, whether or not conversation or communication

ensues, without disclosing his identity and with intent to abuse, threaten, or harass any person.

## JURISDICTION

6.      This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## INFORMATION ABOUT FACEBOOK

7.      Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com.  Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

8.      Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter.  This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.  Facebook also assigns a user identification number to each account.

9.      Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network.  Facebook assigns a group identification number to each group.  A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request."  If the recipient of a "Friend Request"

accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

10.     Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

11.     Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the events time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

12.     Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video. It

also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

13.    Facebook users can exchange private messages on Facebook with other users. Those messages are stored by Facebook unless deleted by the user. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a chat feature that allows users to send and receive instant messages through Facebook Messenger. These chat communications are stored in the chat history for the account. Facebook also has Video and Voice Calling features, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

14.    If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

15.    Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (i.e., non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

16.    Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

17.    Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log

includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend.  The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

18.     Facebook also has a Marketplace feature, which allows users to post free classified ads.  Users can post items for sale, housing, jobs, and other items on the Marketplace.

19.     In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform.  When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

20.     Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address.  These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action.  For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

21.     Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number).  In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users.  Social networking providers like Facebook typically retain records about such communications, including records of contacts

between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

22.     As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, Facebook builds geo-location into some of its services. Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it

relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

23.     Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

## PROBABLE CAUSE

### BACKGROUND INFORMATION

24.     The FBI is currently investigating alleged civil rights violations committed by ROSS MELLINGER, an employee with the Jackson County Sheriff's Department, in Jackson County, WV within the scope of his employment. To-date, several individuals in Jackson County have alleged they are victims of excessive force at the hands of MELLINGER dating back as far as September 2017.

25.     MELLINGER is currently a candidate for sheriff in Jackson County, having secured the Democratic nomination for Sheriff. MELLINGER'S chief competition in the general election is NOEL BRALEY, the Republican nominee for Sheriff.

26.     The FBI learned during its investigation that BRALEY was/is referring alleged victims of excessive force by MELLINGER to a civil attorney named MIKE CLIFFORD. CLIFFORD has filed two (2) federal civil lawsuits against MELLINGER and others based on these referrals.

27.     It is with this backdrop that KEVIN COMER created a fictitious persona "JOSH WILLIAMS" (aka "JJ WILLIAMS") (hereinafter "JOSH WILLIAMS" and "JJ WILLIAMS" will be used interchangeably and refer to the same person), and contacted BRALEY falsely claiming to be a victim of excessive force by MELLINGER in an apparent attempt to get BRALEY to commit an illegal act.  BRALEY then repeated COMER'S false statement to the FBI, believing COMER'S statements to be true.

28.     The FBI spent considerable resources following up on the false statements which BRALEY made to Special Agents concerning WILLIAMS being a victim of excessive force.

29.     The FBI learned during the course of its investigation that COMER, and other known and unknown persons, maintained a Facebook account with the username "JJ WILLIAMS" in an effort to perpetuate this false story created by COMER.

30.     Throughout this affidavit references to WILLIAMS are all actually COMER pretending to be the fictitious WILLIAMS.

31.     During the investigation, the FBI learned that COMER, pretending to be WILLIAMS, would routinely make recorded phone calls to BRALEY discussing his fictitious complaint against MELLINGER, and other false information.  Agents also discovered that the JJ WILLIAMS Facebook page posted out-of-context audio recordings from those conversations in an effort to harm BRALEY'S chance of being elected Sheriff.

32.     The FBI further learned that COMER had previously called BRALEY and warned him to get out of the race for Sheriff or things were going to get "rough."

33.     During the investigation, FBI agents acquired the recordings described in paragraphs 31 and 32 and the quotations and references to those phone calls throughout this affidavit are from the actual recordings of those calls.

**THE INITIAL INVESTIGATION**

34.      In July of 2019 the FBI was referred for investigation alleged civil rights

violations committed by ROSS MELLINGER, an employee of the Jackson County Sheriff's

Department.  At that time, two (2) federal civil lawsuits had been filed against MELLINGER,

and others, based on conduct within the scope of their employment.  The lawsuits concerned

three (3) alleged victims, spanning from September of 2017, to April of 2019.


**THE RACE FOR SHERIFF**

35.      ROSS MELLINGER is currently a candidate for Sheriff in Jackson County, WV.

MELLINGER secured the Democratic nomination in the primary, and will be the Democratic

Party representative on the ballot in the general election on November 3, 2020.

36.      NOEL BRALEY is currently a candidate for Sheriff in Jackson County, WV.

BRALEY secured the Republican nomination in the primary, and will be the Republican Party

representative on the ballot in the general election on November 3, 2020.

37.      Since declaring his candidacy for Sheriff, BRALEY has referred/advised multiple

alleged victims of excessive force by MELLINGER to speak with attorney MIKE CLIFFORD.

CLIFFORD has filed at least two (2) federal civil rights lawsuits against MELLINGER, and

others.

38.      Based on the investigation to-date, there is no indication that BRALEY acted

illegally when he made these referrals to CLIFFORD.

## THE PERSONAL ANIMOSITY

39.     KEVIN COMER is a resident of Kanawha County who has a personal animosity towards NOEL BRALEY.  According to COMER, BRALEY is not qualified and/or corrupt, and should not be elected Sheriff of Jackson County, WV.

40.     On or about October 9, 2019, COMER spoke to BRALEY in a recorded phone conversation.  The phone call was in response to COMER creating a Facebook group designed to harm BRALEY'S chances of being elected Sheriff.  In the recorded conversation, COMER tells BRALEY he is unqualified to be Sheriff and encourages him to drop out of the race.  BRALEY inquires why he [Comer] is doing this.  COMER says *"Here's the thing... Let me tell you the way out of this... Here's the way for you to get out of this... Before more comes out... the way for you to get out of this is to drop out of the race...."*  Prior to hanging up, COMER says *"hang on buckle your seat belt hold on cause its gonna get rough, watch and see..."*

## THE FICTICIOUS PERSONA

41.     On March 10, 2020, KEVIN COMER made a recorded phone call to NOEL BRALEY purporting to be JOSH WILLIAMS.  In the call, the fictitious WILLIAMS states his family is the victim of an unlawful use of force by ROSS MELLINGER.  WILLIAMS states that he was pulled-over for no reason by MELLINGER, after which time his brother-in-law was arrested, and he was forced on his stomach and required to lay on the ground by MELLINGER for no valid reason.  WILLIAMS stated that the event was recorded by his wife, and that he wanted to sue MELLINGER.  BRALEY informed the fictitious WILLIAMS that he had a couple of other people with similar complaints about MELLINGER that he was going to provide to the FBI.  WILLIAMS informed BRALEY he would tell the FBI anything he wanted him to say

regarding parts of the interaction that were not recorded.  BRALEY informed WILLIAMS he

(WILLIAMS) would be talking to an FBI agent so he needed to tell the truth.

42.      A second recorded call was exchanged between BRALEY and the fictitious

WILLIAMS on March 10, 2020.  In the second call, BRALEY informed WILLIAMS that he

was going to see the FBI the following day (March 11, 2020).  BRALEY informed WILLIAMS

the FBI would want to talk to him and he should tell the truth when speaking to the FBI.

BRALEY informed WILLIAMS that what MELLINGER had done to him was an unlawful use

of MELLINGER's authority to try to influence an election.  WILLIAMS provided BRALEY

with more details regarding what MELLINGER had done to him.  WILLIAMS informed

BRALEY he had been pulled over without cause.  MELLINGER placed handcuffs on

WILLIAMS after placing his hands behind his back and laid him on the ground face first.

MELLINGER removed a can of mace and shook the can.  WILLIAMS informed BRALEY he

thought MELLINGER was going to mace him.  MELLINGER then put his foot on

WILLIAMS's head.  MELLINGER also looked through WILLIAMS's wife purse without any

probable cause.  WILLIAMS informed BRALEY that his wife, children, and brother-in-law

were in the car.  WILLIAMS advised that his brother-in-law had an outstanding warrant but this

information was not known to MELLINGER when he initiated the stop.  BRALEY explained to

WILLIAMS that this was unacceptable and that the FBI does not fool around and that they (the

FBI) "police the police."  BRALEY once again told WILLIAMS to tell the FBI the same thing

he told him.  BRALEY informed WILLIAMS that he had already spoken to one FBI agent from

Columbus and that agent had given him the number for the Charleston FBI office.  After

discussing the false allegations made by WILLIAMS, BRALEY informed WILLIAMS that he

did not want to have to shoot MELLINGER before he (BRALEY) won the election and that he

considered MELLINGER a rogue cop.  WILLIAMS encouraged BRALEY to keep his gun

handy considering what MELLINGER and the other deputies had done to him.


**THE FALSE STATEMENT**

43.     On March 11, 2020, NOEL BRALEY gave a walk-in complaint to the FBI at their

Charleston, West Virginia location. BRALEY provided information on at least three individuals

who he alleged had their civil rights violated by ROSS MELLINGER.  One of the individuals

BRALEY discussed was JOSH WILLIAMS.  BRALEY's account of what happened to

WILLIAMS was consistent with the audio recordings made by WILLIAMS.  BRALEY provided

a telephone number for WILLIAMS.

44.     After the complaint was taken, the FBI attempted to follow up on the information

relayed by BRALEY.  FBI Agents attempted to call WILLIAMS; however, the phone number

did not work.  FBI Agents attempted to locate a JOSH WILLIAMS in Ripley, West Virginia

(Jackson County, WV), however there were multiple Josh Williams, and the Agents were unable

to identify the WILLIAMS who was communicating with BRALEY.


**THE ON-GOING HOAX**

45.     On March 11, 2020, NOEL BRALEY sent the fictitious JOSH WILLIAMS a text

message alerting him that the FBI would probably be calling him.

46.     Later on March 11, 2020, the fictitious WILLIAMS called BRALEY.

WILLIAMS informed BRALEY the FBI had contacted him.  WILLIAMS informed BRALEY

he had told the FBI that ROSS MELLINGER had maced him during their interaction.  BRALEY

informed WILLIAMS that MELLINGER might have tested the mace canister which would have

resulted in WILLIAMS feeling the effects of the pepper spray.  WILLIAMS informed BRALEY

the FBI wanted to meet with him the following day but he would be unable to because he did not have the gas money to travel to Charleston. BRALEY agreed to provide WILLIAMS with the gas money he would need to travel to Charleston. WILLIAMS informed BRALEY he was not going to tell the FBI that he was seeing a civil attorney. BRALEY informed WILLIAMS the FBI did not care if he pursued a civil case against MELLINGER.

47.     On March 14, 2020, WILLIAMS contacted BRALEY by phone and informed him he had visited with the FBI on Friday, March 13, 2020. WILLIAMS said he provided the phone recording his wife had made to the FBI. WILLIAMS informed BRALEY the FBI did not say if MELLINGER was going to go to jail but they did say he would probably lose his job. WILLIAMS further stated the FBI imaged the video and erased it from his wife's phone so that it would not accidently be posted on social media.

48.     On May 12, 2020, WILLIAMS contacted BRALEY by phone. The two discussed a recent incident where MELLINGER and another deputy had come to WILLIAMS's home. WILLIAMS indicated MELLINGER may have had a gun in his hand. BRALEY informed WILLIAMS that if he thought MELLINGER had a gun in his hand he should tell law enforcement. WILLIAMS asked BRALEY if he could borrow $20 for gas money he would need to travel to Charleston, West Virginia, to meet with federal authorities. BRALEY informed WILLIAMS he could lend him $100 which could be paid back when he reached a settlement with Jackson County. WILLIAMS informed BRALEY he was going to testify in front of a jury on Friday, May 15th.

49.     On Friday, May 15, 2020, based on the report made by NOEL BRALEY, an agent with the FBI sent a text message to the phone number he had for WILLIAMS requesting that WILLIAMS contact him. The fictitious WILLIAMS responded on May 18, 2020 by asking

Page **14** of **22**

when he should call the agent.  On Tuesday, May 19, 2020, the agent responded that WILLIAMS should call him after 4 p.m.

50.     On May 18, 2020, the fictitious WILLIAMS contacted BRALEY by phone and informed him he had met with federal authorities earlier in the day.  WILLIAMS also informed BRALEY he had testified in front of a jury.  WILLIAMS reiterated that MELLINGER was going to be fired.  WILLIAMS told BRALEY he had told them MELLINGER came to his house and tried to intimidate him.  WILLIAMS also told BRALEY he had informed the jury that MELLINGER had maced him during their first interaction. On multiple occasions, WILLIAMS suggested he would fabricate MELLINGER brandishing a weapon. BRALEY instructed WILLIAMS that he needed to be careful and not perjure himself.   When WILLIAMS informed BRALEY he was going to say MELLINGER had pointed a gun at him, BRALEY informed WILLIAMS to not do that.  During this conversation, WILLIAMS and BRALEY discussed BRALEY lending WILLIAMS $500.  BRALEY said that he would lend WILLIAMS the money but he needed to understand this was not for his testimony.  BRALEY pointed out that WILLIAMS had in fact already testified.  BRALEY told WILLIAMS he could pay him back once a settlement was reached with Jackson County.

51.     On May 19, 2020, WILLIAMS contacted BRALEY by phone and informed him he was meeting with federal authorities including someone from Washington, D.C. later in the day. WILLIAMS asked BRALEY for advice on what he should say.  BRALEY informed WILLIAMS to tell the truth and to just tell them what happened.  WILLIAMS informed BRALEY that he had been followed by MELLINGER and others in unmarked cars. MELLINGER informed BRALEY he was going to lie about the number of times he had been followed.  BRALEY informed WILLIAMS to not do that.